| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | ) | |
| | ) | |
| **v.** | ) | **Criminal Action No. 2017-0016** |
| | ) | |
| **JEAN WITHEY,** | ) | |
| | ) | |
| **Defendant.** | ) | |
| _____ | ) | |

**Attorneys:**
**Anna A. Vlasova, Esq.,**
St. Thomas, U.S.V.I.
> *For the United States*

**Michael A. Joseph, Esq.,**
St. Croix, U.S.V.I.
> *For Defendant*

<u>**MEMORANDUM OPINION**</u>

**Lewis, Chief Judge**

THIS MATTER comes before the Court on Defendant Jean Withey's ("Defendant") Motion to Suppress (Dkt. No. 26); the Government's Opposition to Defendant's Motion to Suppress (Dkt. No. 29); evidence presented at a suppression hearing held on November 28, 2017; and the Court-ordered supplemental briefing filed by Defendant (Dkt. Nos. 57, 62, 67) and the Government (Dkt. No. 66). For the following reasons, the Court will grant Defendant's Motion to Suppress.

## I.  FACTUAL BACKGROUND

On April 11, 2017, the Government filed an Information against Defendant charging him with one count of Possession of Cocaine with Intent to Distribute in violation of 21 U.S.C. §§

841(a)(1) and 846(b)(1)(C). (Dkt. No. 17).[1] Homeland Security Investigations ("HSI") Task Force

Officer ("TFO") Joel A. Gifft and Defendant testified at the suppression hearing. The Government

also introduced a DVD video recording of an August 25, 2016 interview of Defendant by TFO

Gifft and HSI Special Agent ("SA") Nathaniel Copping (collectively, the "HSI agents") as an

exhibit. The following facts have emerged from the record before the Court.[2]

On December 3, 2014, Defendant—who was employed at the time as a driver for United

Parcel Service ("UPS")—delivered a package to the UPS office at the Henry E. Rohlsen airport

on St. Croix, Virgin Islands. (Dkt. No. 1-1 at 2). The waybill on the package indicated that it

contained a compressor to be delivered to an address in Pittsburgh, PA, and that the shipper was

NAPA Auto and Truck Parts in St. Croix. *Id.* The package was transported by plane to St. Thomas,

Virgin Islands, *en route* to Pittsburgh.

In St. Thomas, Customs and Border Patrol ("CBP") officers performed an outbound x-ray

inspection of the package. *Id.* From the x-ray, CBP officers observed that the compressor tank

showed signs of recent welding. CBP officers used a probe to further inspect the compressor tank

and discovered a white powdery substance. *Id.* The compressor tank was then opened, and CBP

officers found three bricks of a white powdery substance. The bricks—which weighed

approximately 3.123 kilograms in total—contained cocaine hydrochloride, as determined by later

laboratory testing. *Id.* at 2-3.

---

[1] Prior to filing the Information, the Government commenced this action by filing a Criminal Complaint on March 17, 2017. (Dkt. No. 1).

[2] The Court bases the background factual discussion in this section on the record established at the suppression hearing. The Court provides this information solely for the purposes of this pretrial motion, ever mindful that Defendant is presumed innocent until proven guilty. Most of the facts discussed herein are alleged, but at this stage not conceded or proven beyond a reasonable doubt to the factfinder.

As a UPS employee making deliveries to the airport, Defendant had been issued a Customs security seal that granted him access to the airport ramp in a restricted area of the airport. (Dkt. No. 66 at 2). In August of 2016, Defendant—who was still employed by UPS—received a phone call from a CBP employee he knew as "Miss Sandy." Miss Sandy informed Defendant that he needed to appear at the CBP offices at the Henry E. Rohlsen airport for a training on the Customs security seal program. (Dkt. No. 63 at 78:2-17). Defendant informed Miss Sandy that he would need permission from his manager at UPS—Winston Smith—to leave his normal duties and attend the training. *Id.* CBP then contacted UPS via email requesting that Defendant appear at the CBP offices for a meeting on the Customs security seal. (Dkt. No. 66 at 2). After receiving the email, Mr. Smith called Defendant and "alert[ed] him of the need to meet with CBP for training regarding his security seal." *Id.* at 2 n.1.

On August 25, 2016, Defendant appeared at the CBP offices at the airport. Defendant arrived on his own expecting to participate in the Customs security seal training. (Dkt. No. 63 at 89:5-8). Upon arriving at the CBP building, Defendant was directed to the Customs Seal Office. The Customs Seal Office—as described by TFO Gifft—is a secured area within the CBP building. In order to enter the Customs Seal Office, CBP personnel must be "buzzed in" by a CBP employee. *Id.* at 74:18-76:5. TFO Gifft testified that, to the best of his recollection, it is unnecessary to use the buzzer to leave the Customs Seal Office, although he could not remember the exact mechanism used to exit. *Id.* at 73:24-25. Defendant testified that it is impossible to exit the Customs Seal Office without also being "buzzed out" by a CBP employee. *Id.* at 83:1-16.

The Customs Seal Office contains a training room, where TFO Gifft and SA Copping were waiting to interview Defendant upon his arrival. *Id.* at 9:21-22. TFO Gifft described the training room as a room with windows and approximately four tables and 16 computers. *Id.* at 10:2-6. The

HSI agents did not pat Defendant down as he entered the training room, nor did they place him in handcuffs or otherwise restrain him. *Id.* at 89:13-18. Defendant was seated at a table in the training room, next to the aisle. TFO Gifft sat on the other side of the table across from Defendant, while SA Copping sat next to Defendant, away from the aisle. *Id.* at 11:12-12:9. TFO Gifft testified that the door to the training room was unlocked during the ensuing interview. *Id.* at 12:12-15. The HSI agents recorded the interview, although they did not inform Defendant that the interview was being recorded. *Id.* at 23:5-16.[3]

The HSI agents proceeded to interview Defendant for approximately two-and-one-half hours. *Id.* at 12:16-17. Approximately 15 minutes at the beginning of the interview were dedicated to pleasantries and a discussion of the Customs security seal program and Defendant's general duties as a UPS driver.[4] After reviewing Customs security seal procedures, SA Copping told Defendant that the reason for the interview was HSI's concern with contraband being smuggled through the airport in UPS packages. Defendant initially stated that he was unaware of any suspicious packages delivered to the airport through UPS. Approximately 20 minutes into the interview, TFO Gifft asked Defendant if he was being one-hundred percent truthful with the HSI agents. SA Copping then informed Defendant that the HSI agents had evidence pointing to Defendant with respect to UPS packages containing contraband that were delivered to the airport. The HSI agents showed Defendant documents—including waybills from items shipped through

---

[3] Based on its review of the video recording, the Court notes that TFO Gifft started the recording before Defendant entered the training room and introduced it as an interview with Defendant regarding a "UPS contraband smuggling case."

[4] Information with respect to the content of the interview is based on the Court's review of the video recording, unless another reference is indicated.

UPS that CBP had identified as containing contraband. *Id.* at 81:10-17. The waybills bore Defendant's signature as the UPS employee who had delivered the packages. *Id.*

After showing Defendant the waybills, TFO Gifft told Defendant he should "help himself" by being truthful with the agents with respect to his knowledge of the contraband in the packages. *Id.* at 44:18-24. When asked at the suppression hearing why he felt the need to inform Defendant that he should be truthful with the HSI agents, TFO Gifft responded: "Because of the evidence that was presented to him." *Id.* at 72:2-5. TFO Gifft confirmed that the HSI agents suspected Defendant's involvement in criminal activity prior to commencing the interview, and that the interview with Defendant was arranged in order to obtain information from Defendant regarding that criminal activity. *Id.* at 43:4-17. TFO Gifft further testified that—even before Defendant was called to the CBP offices—the HSI agents had sufficient evidence to recommend Defendant's disqualification from the security seal program. *Id.* at 68:20-23. TFO Gifft also stated that the interview was held notwithstanding the evidence already in HSI's possession in order "[t]o re-familiarize [Defendant] with the guidelines, and to let him know it was a privilege, and to give him an opportunity to come forward and be forthcoming." *Id.* at 69:6-11.

It is undisputed that the HSI agents did not administer *Miranda* warnings to Defendant. In addition, Defendant was neither informed that he was under arrest nor informed that he was free to leave at any point during the interview. *Id.* at 10:23-11:5. Defendant never asked to leave or indicated that he wanted to leave. Defendant testified that he never requested to leave the interview because he did not feel that leaving was an option given that he was sent to the CBP offices by his supervisor at UPS. *Id.* at 91:16-25. He also testified that he did not believe that he had the right to get up and leave because he was being interviewed by two federal officers. *Id.* at 92:1-10. During

the interview, Defendant was permitted to take two breaks and leave the training room unescorted to go to the restroom and get water. *Id.* at 13:18-14:14.

TFO Gifft testified that while both he and SA Copping were carrying firearms during the interview, the firearms were concealed on their bodies. *Id.* at 16:19-23. Neither he nor SA Copping intentionally displayed their firearms to Defendant during the interview. *Id.* at 16:24-17:13. TFO Gifft further testified that neither he nor SA Copping threatened Defendant during the interview. However, he also testified that the HSI agents made Defendant aware that his involvement in contraband smuggling could disqualify him from possessing a Customs security seal—which Defendant needed to perform his duties at UPS. *Id.*

## II. DISCUSSION

Defendant argues that the HSI agents violated his *Miranda* rights by subjecting him to a custodial interrogation during the August 25, 2016 interview without providing *Miranda* warnings. The Government responds that the HSI agents were not required to provide Defendant with *Miranda* warnings because Defendant was never "in custody" for purposes of the *Miranda* analysis.[5]

---

[5] In his Motion to Suppress, Defendant also contends that his statements to the HSI agents were involuntary for purposes of a Fifth Amendment analysis. (Dkt. No. 26 at 4-5). Arguments at the suppression hearing and in the parties' supplemental briefings, however, focused on the *Miranda* inquiry. The Court notes that the Fifth Amendment voluntariness inquiry remains relevant even where a *Miranda* violation is found because a defendant's voluntary statement may be admissible at trial for impeachment purposes even if taken in circumstances violating *Miranda*. *See United States v. Jacobs*, 431 F.3d 99, 108 n.11 (3d Cir. 2005) ("While '[s]tatements made by a defendant in circumstances violating . . . *Miranda* . . . are admissible for impeachment if their trustworthiness . . . satisfies legal standards[,] . . . *any* criminal trial use against a defendant of his *involuntary* statement is a denial of due process of law . . . .'" (quoting *Mincey v. Arizona*, 437 U.S. 385, 397-98 (1978)) (emphasis in original). Here, because the question of whether Defendant's statements to the HSI agents were involuntary under the Fifth Amendment has not been fully briefed, the Court will reserve any ruling on that issue for a later time in the event such a ruling is necessary.

## A.    Applicable Legal Standards

In *Miranda v. Arizona*, 384 U.S. 436 (1966), the Supreme Court held that the "prosecution may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination." *Id.* at 444. *Miranda*'s holding is based on a recognition "that interrogation in certain custodial circumstances is inherently coercive," and suspects must therefore be "specifically informed of [their] *Miranda* rights and freely decide[] to forgo those rights" to ensure the right against compulsory self-incrimination. *New York v. Quarles*, 467 U.S. 649 (1984). *Miranda* warnings are required whenever a suspect has been (1) "taken into custody or otherwise deprived of his freedom of action in any significant way" and (2) subject to "interrogation" by the Government. *Steigler v. Anderson*, 496 F.2d 793, 798 (3d Cir. 1974) (quoting *Miranda*, 384 U.S. at 444; *United States v. Dupree*, 617 F.3d 724, 731 n.7 (3d Cir. 2010) (plurality opinion)).

A suspect is "in custody" when "there is a formal arrest or restraint on freedom of movement of the degree associated with a formal arrest." *United States v. Leese*, 176 F.3d 740, 743 (3d Cir. 1999) (quoting *California v. Beheler*, 463 U.S. 1121, 1125 (1983) (quotations omitted)). "[T]he determination of custody is an objective inquiry (that is, what a reasonable person would believe)" in which courts ask "first, what were the circumstances surrounding the interrogation; and second, given those circumstances, would a reasonable person have felt that he or she was not at liberty to terminate the interrogation and leave." *United States v. Jacobs*, 431 F.3d 99, 105 (3d Cir. 2005) (quoting *Yarborough v. Alvarado*, 541 U.S. 652, 663 (2004) (internal quotations omitted) (emphasis removed)). "For a person to be in custody when he has not been arrested, 'something must be said or done by the authorities, either in their manner of approach or

in the tone or extent of their questioning, which indicates that they would not have heeded a request to depart or to allow the suspect to do so.'" *United States v. Willaman*, 437 F.3d 354, 359 (3d Cir. 2006) (quoting *Steigler*, 496 F.2d at 799 (internal quotations omitted)). "[T]he relevant environment [must] present[] the same inherently coercive pressures as the type of station house questioning at issue in *Miranda*." *United States v. Arena*, 629 F. App'x 453, 457 (3d Cir. 2015) (quoting *Howes v. Fields*, 132 S. Ct. 1181, 1190 (2012)).

The second prong of the *Miranda* analysis requires that the defendant be interrogated by the government. An "interrogation" has been defined as "(a) conduct intentionally designed to evoke a confession, as well as (b) any conduct an officer should reasonably have foreseen would elicit an inculpatory response." *United States v. Bonner*, 469 F. App'x 119, 126 (3d Cir. 2012) (citing *Rhode Island v. Innis*, 446 U.S. 291, 301 (1980)).

## B.    Analysis

### 1.    Custody

The Third Circuit has identified several factors that courts should weigh in determining whether an individual is "in custody" during questioning for purposes of the *Miranda* analysis. These include:

> (1) whether the officers told the suspect he was under arrest or free to leave; (2) the location or physical surroundings of the interrogation; (3) the length of the interrogation; (4) whether the officers used coercive tactics such as hostile tones of voice, the display of weapons, or physical restraint of the suspect's movement; and (5) whether the suspect voluntarily submitted to questioning.

*United States v. Willaman*, 437 F.3d 354, 359–60 (3d Cir. 2006) (citing *United States v. Czichray*, 378 F.3d 822, 827 (8th Cir. 2004); *United States v. Hayden*, 260 F.3d 1062, 1066 (9th Cir. 2001); *United States v. Crossley*, 224 F.3d 847, 861 (6th Cir. 2000)). Courts should also consider "the information known by the officer[s] concerning the suspect's culpability," *Jacobs*,

431 F.3d at 105 (citing *Steigler*, 496 F.2d at 799), and "whether the officer[s] revealed [their] belief that the suspect was guilty." *Id.* (citing *Stansbury v. California*, 511 U.S. 318, 325 (1994)). Custody determinations for *Miranda* purposes are "made on a case-by-case basis" by considering "the totality of the circumstances." *United States v. Killingsworth,* 118 F. App'x. 649, 650 (3d Cir. 2004) (citing *Stansbury,* 511 U.S. at 325). Here, based on the totality of the circumstances, the Court finds that Defendant was in custody during his questioning by TFO Gifft and SA Copping.

With regard to the first factor, the record indicates that the HSI agents neither informed Defendant he was under arrest nor informed him that he was free to leave during the interview. As noted by the Third Circuit in *United States v. Jacobs*, 431 F.3d 99 (3d Cir. 2005), where a defendant is "not told anything regarding [his] arrest, pro or con, this factor falls somewhat in [his] favor." *Id.* at 106 (distinguishing situations where officers explicitly inform a defendant that he is *not* under arrest prior to an interview).[6] Upon consideration of this factor in the context of the circumstances discussed below, the Court concludes that it weighs somewhat in Defendant's favor.[7]

---

[6] The Government points to the fact that there was discussion during the interview about the scheduling of a second interview with Defendant as evidence that the HSI agents implied to Defendant that he would be leaving on his own at the end of the first interview. *Id.* at 69:12-23. The Court notes, however, that this discussion did not occur until after Defendant had provided inculpatory statements to the HSI agents, and thus does not bear on the question of whether Defendant reasonably believed that he could terminate the interview and leave prior to providing the statements. *See Jacobs*, 431 F.3d at 107 (noting that "just because an officer lets a suspect leave after he or she has gotten all the desired incriminating evidence does not mean the officer would have let the suspect leave (or, to be more precise, it does not mean the officer made the suspect believe she or he could leave) during the questioning").

[7] The Government argues, citing *United States v. Laurita*, 821 F.3d 1020 (8th Cir. 2016), that the first factor should weigh in the Government's favor because—although the HSI agents never explicitly told Defendant he was not under arrest—"nothing about the circumstances or the actions of the agents would indicate otherwise . . . ." (Dkt. No. 66 at 4). However, the *Laurita* court did not conclude that the absence in that case of an express indication by FBI agents that Laurita was free to leave the interview weighed in the government's favor. Rather, in reversing the district

The second factor concerns the location of the interview. In this case, the interview occurred in a training room within the Customs Seal Office at the CBP airport offices. The Customs Seal Office is inaccessible to the public, and individuals must be "buzzed in" by a CBP employee to enter. Although there was conflicting testimony regarding whether an individual must be similarly "buzzed out," the testimony established that the Customs Seal Office is a secured area. The training room itself is a room with its own door within the Customs Seal Office.

The Government argues that the location of the interview weighs in its favor because the interview was held in a training room rather than an interrogation room; the door to the training room was not locked; the training room had windows and a loudspeaker; and Defendant had unencumbered access to the aisle and door. The Government points to the Eighth Circuit's decision in *United States v. Laurita*, 821 F.3d 1020 (8th Cir. 2016), in support of its argument.

In *Laurita*, FBI agents arrived at the telemarketing firm where Laurita was employed to request a "short conversation" with him in relation to an on-going child pornography investigation. *Id.* at 1022. The FBI agents interviewed Laurita in the human resources area of the office, where he was directed to appear by his supervisor. *Id.* Although the door to the conference room was closed, there was no evidence in the record that it was locked, and Laurita "had a clear pathway to the door." *Id.* at 1025. The Eighth Circuit determined that these facts with respect to the location of the interview—in addition to the absence of evidence that Laurita was otherwise restrained—

---

court's decision to suppress Laurita's statements, the Eighth Circuit noted that the district court "*may have placed undue importance*" on the fact that the FBI agents did not inform Laurita that he was free to leave, particularly where the FBI agents' actions did not otherwise indicate that Laurita was in custody. *Id.* at 1024 (emphasis added). Here, the Court is not placing undue importance on this factor standing alone. Rather, it concludes that the factor falls somewhat in Defendant's favor within the context of all the relevant circumstances as discussed further below. Moreover, it is the Third Circuit's ruling in *Jacobs*, not the Eighth Circuit's ruling in *Laurita*, that is binding on this Court.

supported a conclusion that Laurita's freedom of movement was not restricted for purposes of the custody determination. *Id.*

Defendant—contrasting *United States v. Willaman*, 437 F.3d 354, 360 (3d Cir. 2006)—contends that the fact that the interview occurred in a secured office within the CBP building suggests custody. In *Willaman*, the Third Circuit noted that the circumstances of an interrogation weighed against a finding of custody where a defendant provided statements to officers "at his own residence . . . ." *Id.* at 360 (citing *United States v. Czichray*, 378 F.3d 822, 826 ("When a person is questioned *on his own turf* . . . the surroundings are not indicative of the type of inherently coercive setting that normally accompanies custodial interrogation."). Defendant contends that the interview here, in contrast, occurred in a restricted area on "CBP's turf." (Dkt. No. 67 at 2).

The Court concludes that this second factor—the location of the interview—weighs somewhat in favor of a finding that Defendant was in custody when considered in conjunction with the other relevant factors discussed herein. While Defendant's pathway to the unlocked door of the interview room was not restricted, the Customs Seal Office itself is a secured area within CBP's airport offices—access to which is controlled from within by a CBP employee. The location of the interview in *Laurita*—the workplace of the suspect—was less indicative of custody than was the location in the instant case. A secured area within the offices of a law enforcement agency is an inherently more intimidating location than the human resources office at a suspect's place of employment. *See United States v. King*, 604 F.3d 125, 138 (3d Cir. 2010) (recognizing that an interrogation at an "FBI office is inherently more intimidating than most locations such as a business office, an automobile, or a public street"—although the totality of the circumstances in *King* did not support a finding of custody). The Court concludes that, by interviewing Defendant within the secured Customs Seal Office at the CBP airport offices under the circumstances here,

the HSI agents created surroundings that were suggestive of the type of station house interrogation that "should be scrutinized with extreme care for any taint of psychological compulsion or intimidation . . . ." *Steigler*, 496 F.2d at 799.

With respect to the third factor—the two-and-one-half hour length of the interview—there is no "bright line rule regarding how long an interrogation must last to constitute a finding that a person is in custody," as the length of an interview must be considered within the context of the totality of the circumstances. *United States v. Isles*, 2015 WL 327143, at *9 (D.V.I. Jan. 26, 2015) (citing *King*, 604 F.3d at 138; *United States v. Morgan*, 562 F. App'x 123, 130 (3d Cir. 2014); *United States v. Griggie*, 105 F. App'x 431, 436 (3d Cir. 2004)). Not surprisingly then, courts have arrived at different conclusions as to whether interviews of approximately two-and-one-half hours favor a finding of custody. *See, e.g., United States v. Gunter*, 2013 WL 1102994, at *3 (E.D. Pa. Mar. 15, 2013) ("The interview took place in the morning and lasted no more than two and a half hours. The length of the interview here does not weigh in favor of finding that Gunter was in custody."); *United States v. Devlin–Bell*, 2013 WL 194200, at *8 (E.D. Pa. Jan. 17, 2013) ("The length of the encounter, about two hours, may weigh slightly in favor of custody; although, this fact alone is certainly not dispositive."); *Yarborough v. Alvarado*, 541 U.S. 652 (2004) (noting that while the two-hour length of the interview in question pointed in the direction of custody, a state court's determination that the suspect was not in custody was reasonable under the totality of the circumstances). Although this factor alone is not dispositive, the Court finds that the two-and-one-half hour length of the interview in this case weighs moderately in favor of a finding of custody under the totality of the circumstances—particularly in light of the means by which Defendant's presence for the interview was procured, as discussed below.

The fourth factor the Court must consider is "whether the officers used coercive tactics such as hostile tones of voice, the display of weapons, or physical restraint of the suspect's movement . . . ." *Willaman*, 437 F.3d at 359-60.

In this case, Defendant was not subject to a pat-down search, placed in handcuffs, or otherwise physically restrained during the interview. In addition, TFO Gifft and SA Copping did not use hostile tones in terms of yelling or screaming.[8] Defendant was also allowed to take breaks from the interview to get water and go to the restroom unescorted. Finally, although they were armed, neither HSI agent intentionally displayed a firearm to Defendant during the interview. Based on these considerations, the Court concludes that this factor weighs in favor of the Government.

The fifth factor asks whether Defendant voluntarily submitted to questioning by the HSI agents. Defendant contends that his appearance for the interview was not voluntary because he was ordered to appear at the CBP offices by his supervisor at UPS—at CBP's request—for what he understood would be training on the Customs security seal. (Dkt. No. 21 at 3). Defendant testified that one reason he felt he could not terminate the interview and leave was that he was sent to the interview by his employer. (Dkt. No. 63 at 86:18-23). The Government counters that Defendant's appearance was voluntary in that Defendant arrived at the interview on his own; answered the HSI agents' questions; never indicated that he wanted to leave or terminate the interview; and was permitted to leave at the end of the interview. (Dkt. No. 66 at 8). The Government further asserts that—regardless of his employer's order to attend training—a reasonable person in Defendant's position would have felt free to end the interview and leave once it became apparent that he was not at the CBP offices for training. (Dkt. No. 63 at 102:17-108:3).

_____

[8] Discussed below, however, is the intimidating nature of the questioning.

At the suppression hearing, the Government pointed to *United States v. King*, 604 F.3d 125 (3d Cir. 2010), in support of its position. (Dkt. No. 63 at 100:9-101:10). In *King*, FBI agents investigating a child pornography case executed search warrants on King's residence and seized computers. *Id.* at 132. King, who had been aware of the investigation even before the execution of the search warrant, initially declined an invitation by FBI Agent James Kyle to speak in person. *Id.* King later changed his mind, and called to arrange a meeting with Agent Kyle at the FBI office. *Id.* King arrived for the meeting at the FBI office on his own, and Agent Kyle led him to an interrogation room. *Id.* Before questioning King, "Agent Kyle told King he was free to leave at any time and that the interview was voluntary." *Id.* King then made inculpatory statements to Agent Kyle. *Id.* at 133. In affirming a district court's determination that King was not in custody for *Miranda* purposes when he made the inculpatory statements, the Third Circuit noted—among other factors—that "King voluntarily submitted to the questioning after previously refusing, and departed when he chose to do so." *Id.* at 138.

The facts of *King* are clearly distinguishable from those of the instant case. King was aware of the child pornography investigation prior to agreeing to speak with Agent Kyle. After first declining to speak with Agent Kyle, King subsequently took the initiative to call Agent Kyle and arrange a meeting. Defendant, on the other hand, was not aware that he was under investigation and went to the CBP offices with the understanding that the purpose of his visit was to participate in training on the Customs security seal program—not to be questioned by HSI agents regarding his alleged criminal activity. Further, Agent Kyle informed King that the interview was voluntary

and that he was free to leave at any time. The HSI agents made no such statement to Defendant before questioning him.[9]

The Court finds the facts of *United States v. Jacobs*, 431 F.3d 99 (3d Cir. 2005), to be more analogous to those present here. Jacobs was a confidential informant for the FBI and had provided information to the FBI for ten years prior to the events leading to her criminal prosecution. *Id.* at 102. After the FBI became suspicious that Jacobs was providing incomplete information regarding a drug trafficking conspiracy, the FBI closed her as an informant, without so informing her. *Id.* at 103. Her primary law enforcement contact—Special Federal Officer ("SFO") Liam Sullivan— then called Jacobs and "told her he needed to see her right away," without revealing the purpose of the meeting to her. *Id.* In response to SFO Sullivan's phone call, Jacobs arrived at the FBI office along with her son, where she waited for approximately 30 minutes in a room used to interview suspects. *Id.* SFO Sullivan left two suitcases that he believed Jacobs had used in transporting drugs in the interview room *Id.* SFO Sullivan later asked Jacobs' son to leave and—without providing *Miranda* warnings—confronted Jacobs with information that she was involved in a drug

---

[9] The Government also cited *Yarborough v. Alvarado*, 451 U.S. 652 (2004), in support of its position during argument at the suppression hearing. (Dkt. No. 63 at 108:17-109:2) In that case— while noting that "fairminded jurists could disagree over whether Alvarado was in custody" when he was questioned with regard to his involvement in a murder—the Supreme Court held that a state court's determination that he was not in custody was a reasonable application of the Supreme Court's custody standard. *Yarborough*, 451 U.S. at 664-65. One factor the Supreme Court identified as weighing against a finding of custody was that "[t]he police did not transport Alvarado to the station or require him to appear at a particular time." *Id.* at 664. Instead, Alvarado—who was 17 years old—arrived at the police station with his parents after a police officer contacted his mother and requested an interview with him. *Id.* at 656.

The facts of *Yarborough* are distinguishable from those of the instant case. Although Defendant was not transported to the CBP offices by law enforcement, he arrived on his supervisor's orders— made at the request of CBP—to participate in a training. Defendant was unaware that he would be questioned regarding alleged criminal activities. Defendant's appearance at the CBP offices under these circumstances cannot reasonably be equated to Alvarado's arrival at a police station for questioning in response to an officer's request for an interview.

trafficking conspiracy and questioned her about her involvement, at which point Jacobs made inculpatory statements. *Id.* at 103-04.

A district court later determined that Jacobs was in custody for *Miranda* purposes during this interview because—among other factors—"Jacobs felt obligated to come to and stay at the questioning because she was reasonably under the impression that she was still an FBI informant." *Id.* at 105. Affirming the district court's finding, the Third Circuit rejected the contention that Jacobs had come to the FBI office voluntarily where (1) SFO Sullivan told Jacobs he needed to see her right away and would not reveal the purpose of the meeting; (2) "Jacobs was led to believe she was still an informant and thus likely felt an obligation to follow the directions of her handler;" and (3) Jacobs was required to abide by the instructions of the FBI, as indicated by the "FBI informant admonition forms." *Id.* at 106. Thus, the Third Circuit determined that "while Jacobs was not physically forced to go to the FBI offices [], her decision to go cannot fairly be said to have been 'voluntary' . . . ." *Id.*[10]

Similarly, Defendant's decision to arrive at the CBP offices cannot fairly be considered a voluntary submission to questioning by the HSI agents. Defendant was informed by his employer, on CBP's request, that he had to go to the CBP offices for training on the Customs security seal, which Defendant was required to carry to make deliveries for UPS in the restricted area of the airport. Defendant testified that he felt an obligation to attend the training on the orders of his employer. He did not expect to be questioned about criminal activity. Based on the Court's review of the video recording of the interview, TFO Gifft and SA Copping spent approximately 15 minutes at the outset of the two-and-one-half hour interview with pleasantries and a review of

---

[10] The Third Circuit also found relevant the fact that Jacobs "did not agree to meet with [SFO] Sullivan with knowledge of the fact that questioning about a criminal offense would take place." *Id.* at 107.

procedures related to the Customs security seal before launching into questions regarding Defendant's alleged involvement in criminal activity. [11] At no point did they inform Defendant that his presence was voluntary. Under these facts, the Court is not persuaded by the Government's arguments that a reasonable person in Defendant's position would have felt free to end the interview and leave upon realizing that he was not, in fact, participating in training. Further, the Court notes that, although Defendant was permitted to leave the CBP offices at the end of the interview, "the test for custody is not whether the police in fact let a suspect leave *at the end* of the questioning without hindrance. Rather, it is whether, under the circumstances, a reasonable person *would have believed* that *during* the questioning he or she could leave without hindrance." *Jacobs*, 431 F.3d at 106-07 (emphasis in original). The Court concludes that this was not the case here. In view of the foregoing, the Court finds that the fifth factor weighs in favor of Defendant under the circumstances presented.

Two additional factors are: (1) the information known by the HSI agents with respect to Defendant's culpability prior to the questioning, and (2) the extent to which the agents revealed that belief to Defendant during the questioning. As described by the Third Circuit, "[t]he more cause for believing the suspect committed the crime, the greater tendency to bear down in interrogation and create the kind of atmosphere of significant restraint that triggers *Miranda*, and vice versa." *Steigler*, 496 F.2d at 799 (quoting *United States v. Hall*, 421 F.2d 540, 545 (2d Cir.

---

[11] The Government appears to recognize that the means by which Defendant's appearance for the interview was procured constituted "deceptive behavior." (Dkt. No. 66 at 7). However, citing *Laurita*, it argues that "deceptive behavior is irrelevant to the custody determination 'unless it relates to a reasonable person's perception of his freedom to depart.'" *Id.* (quoting *Laurita*, 821 F.3d at 1026). The Court finds this argument unavailing because the deceptive behavior at issue here—luring Defendant to the CBP offices through his employer on the pretense of a training regarding a credential necessary for Defendant's employment—would be directly related to a reasonable person's perception of his freedom to depart.

1969)); *see also Stansbury v. California*, 511 U.S. 318, 325 (1994) ("An officer's knowledge or beliefs may bear upon the custody issue if they are conveyed, by word or deed, to the individual being questioned.").

TFO Gifft testified at the suppression hearing that he and SA Copping had collected sufficient evidence to recommend Defendant's disqualification from the Customs seal program before Defendant was told to report for the "training." (Dkt. No. 63 at 68:20-23). He also acknowledged that the HSI agents suspected Defendant's involvement in criminal activity prior to commencing the interview, and that they were seeking information relevant to that criminal activity during the interview. *Id.* at 43:4-17.

The Court's review of the recorded interview confirmed this testimony, and shed further light on the HSI agents' use of the evidence they had collected and the extent to which they conveyed their beliefs regarding Defendant's guilt during the interview. The HSI agents informed Defendant that they had sufficient evidence to support his criminal prosecution and presented incriminating evidence in the form of waybills bearing his signature, telling Defendant that the waybills provided proof of his involvement in contraband smuggling.[12] SA Copping told Defendant that it was rare for HSI agents to find such "black-and-white evidence" in their investigations, and TFO Gifft confirmed that the evidence against Defendant was a "straight slam dunk." The HSI agents made similar comments about the Customs security seal. SA Copping said to Defendant: "Based on what we have right now, we are going to take your Customs seal. There is really not much question about that." TFO Gifft expressed similar sentiments, stating: "That

---

[12] SA Copping stated, for example: "[W]hat we have from these documents is enough for a criminal prosecution, and to charge you with possession and distribution of cocaine. That is something that, as I am sure you are aware, carries a serious penalty."

Customs seal? That is it for you. Ain't no more UPS boss, basically. And I am sure you have got to feed your kids, boss."

In *Jacobs*, the Third Circuit determined that a defendant was in custody where, among other factors, the officer's questions were "confrontational and intimidating;" the officer employed "interrogation tactics, including placing incriminating [evidence] in [the defendant's] view;" and the officer "communicated to [the defendant] that he thought she was guilty." *Jacobs*, 431 F.3d at 107. The same is true here. Accordingly, the Court concludes that the two additional factors support a finding of custody.

In sum, under the totality of the circumstances in this case, the Court concludes that Defendant was in custody for *Miranda* purposes when he was questioned by TFO Gifft and SA Copping. At the request of CBP, Defendant was directed by his supervisor to appear at the CBP airport offices for training on his Customs security seal—a credential necessary to the performance of his job duties at UPS. He felt an obligation to attend the training on orders of his supervisor. He was unaware that questioning about alleged criminal activity would take place. While Defendant's presence at the CBP offices was secured through the pretext of training on his Customs security seal, upon arrival he was interviewed by two HSI agents who had already gathered sufficient incriminating evidence against Defendant to strip him of the Customs security seal and refer the matter for criminal prosecution. The interview occurred in a secured Customs Seal Office—access to which was controlled from within by a CBP employee. All but approximately 15 minutes of the ensuing two-and-one-half hour interview consisted of questioning related to Defendant's alleged participation in criminal activity. The interview was confrontational and intimidating in that the HSI agents: confronted Defendant with evidence of his guilt by presenting him with waybills that bore his signature; forcefully expressed their belief in the strength of the evidence against him; and

forecasted the loss of his Customs security seal, and therefore his UPS job. At no point did the HSI agents inform Defendant that he was free to leave the interview. Defendant felt an obligation to stay because he was sent by his employer and was being interviewed by two federal officers. Upon consideration of the totality of the circumstances in this case, the Court finds that Defendant was in custody for purposes of *Miranda* during the interview.

### 2. Interrogation

In its supplemental brief, the Government conceded—in response to the Court's specific inquiry on the issue—that the HSI agents' questioning of Defendant constituted an interrogation for purposes of *Miranda*. (Dkt. No. 66 at 9). The Court agrees that the HSI agents subjected Defendant to an interrogation by asking questions designed to evoke a confession. *See United States v. Bonner*, 469 F. App'x 119, 126 (3d Cir. 2012) (defining "interrogation" as "(a) conduct intentionally designed to evoke a confession, as well as (b) any conduct an officer should reasonably have foreseen would elicit an inculpatory response) (citing *Rhode Island v. Innis*, 446 U.S. 291, 301 (1980)). The HSI agents presented Defendant with evidence of his involvement in criminal activity, expressed their own beliefs regarding Defendants' culpability, and asked questions designed to elicit incriminating statements by Defendant. Accordingly, the Court finds that the questioning of Defendant by the HSI agents in this case constituted an interrogation for *Miranda* purposes.

### III. CONCLUSI ON

For the reasons discussed above, the Court finds that Defendant was subject to a custodial interrogation without the administration of *Miranda* warnings. Accordingly, the Court will grant Defendant's Motion to Suppress. Because Defendant's statements to the HSI agents during the

custodial interrogation were not preceded by *Miranda* warnings, they are inadmissible as evidence

in the Government's case-in-chief.

An appropriate Order accompanies this Memorandum Opinion.

Date: March 22, 2018

_____/s/_____
WILMA A. LEWIS
Chief Judge